IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 15, 1999 Session

## BILLY RHODES STEAGALL v. NANCY ROSE STEAGALL

Appeal from the Chancery Court for Marshall County
No. 7194    F. Lee Russell, Judge

No. M1998-00948-COA-R3-CV - Filed July 27, 2001

This appeal involves a post-divorce dispute regarding the custody of a 15-year-old boy.  In August 1997, the boy's father petitioned the Chancery Court for Marshall County to change the minor's custody because of his concern that the mother's attempt to home school the boy had undermined his education and development of social skills.  The mother opposed the petition and requested an increase in child support.  During the June 1998 trial, the father presented evidence raising serious questions about the progress of the child's education and development of social skills, as well as other aspects of the mother's approach to parenting.  The mother presented no evidence of her own. Instead, after the close of the father's proof, she asserted that the trial court could remediate the acknowledged deficiencies without changing custody.  Thereafter, the parties and the court discussed at length the provisions of a proposed remedial order, and the hearing was adjourned when the parties and the court believed they had agreed on the contents of the proposed order.  Before the trial court entered the proposed order, the wife took issue with a provision requiring her to enroll the child in public school.  The trial court informed the parties that it had understood that both parties had agreed to send their child to public school and that it would resume the trial if its understanding was incorrect.  Rather than requesting the trial court to resume the hearing, the mother filed this appeal claiming that the trial court had infringed on her constitutionally protected right to raise her child. We have determined, in accordance with Tenn. R. App. P. 36(a), that the mother is not entitled to appellate relief because she is, in part, responsible for the error and because she failed to pursue the reasonably available steps that would have nullified the harmful effect of the error.  Accordingly, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Nancy R. Steagall.

Barry B. White, Lewisburg, Tennessee, for the appellee, Billy Rhodes Steagall.

**OPINION**

Nancy Rose Steagall and Billy Rhodes Steagall married in 1981. Their only child, a son, was born in March 1986. The parties were divorced by the Chancery Court for Marshall County in March 1988. In accordance with their marital dissolution agreement, Ms. Steagall received sole custody of their son, and Mr. Steagall received non-specific visitation rights. Mr. Steagall was also required to pay Ms. Steagall $70 per week in child support. Thereafter, Ms. Steagall and the parties' son moved to Culleoka in Maury County. Mr. Steagall remained in Lewisburg and eventually remarried. Ms. Steagall is employed as a paramedic by the Williamson Medical Center Emergency Medical Service, and Mr. Steagall is employed as a paramedic by the Rutherford County Ambulance Service.

After the divorce, Ms. Steagall, as the custodial parent, made all the major decisions regarding the child's education, his exposure to his extended family, and the nature of his visitation with Mr. Steagall. Even though she was elected to the Maury County Board of Education, Ms. Steagall withdrew her son from public school after the third grade and began home schooling him. Her decision was based, in large part, on her Christian beliefs and her apprehensions about the public school curriculum. Ms. Steagall home schooled the parties' son for the fourth, fifth, and sixth grades. During these years, Mr. Steagall grew increasingly concerned about the boy's attitude about his studies and his social skills.

Things came to a head in 1997. Mr. Steagall decided that Ms. Steagall's style of parenting and her heavy-handed attempts at gate-keeping between him and his son were adversely affecting the child's development. He was concerned about the adequacy of the boy's education and the development of his social skills. He was also concerned that Ms. Steagall had gone too far in trying to shape the boy's world view. Finally, he was concerned that his own differing views about parenting were causing his efforts at visitation to become extremely contentious. In August 1997, after the boy expressed a desire to live with him, Mr. Steagall petitioned the Chancery Court for Marshall County to change custody. Ms. Steagall objected to changing custody and requested an increase in child support.

The trial court conducted a hearing in Jun 1998 on the issues of custody and child support. Mr. Steagall, as the moving party, had the burden of proving that there had been a material change in the child's circumstances and that it would be in the child's best interests to change custody. He undertook to carry this burden by suggesting that the trial court interview the parties' son in chambers and by presenting his own testimony as well as that of Ms. Steagall. At the lawyers' request, the trial court interviewed the parties' son in chambers before hearing the other witnesses. The lawyers were present during the interview, but the parents were not.[1] Thereafter, Mr. Steagall's

---

[1] The record does not contain a transcript or summary of the trial court's interview with the parties' son. However, the transcribed comments of the trial court and the lawyers at other stages of the proceeding indicate that the child told that trial court that he desired to live with Mr. Steagall, at least in part, to enable him to see the other members of Mr. Steagall's family more.

lawyer called Ms. Steagall as his first witness. Ms. Steagall's testimony plainly did not help her cause. Mr. Steagall's lawyer was able to elicit testimony that made her appear extremely overprotective[2] and unable to accept that Mr. Steagall had remarried and was moving on with his life.[3]

Most significantly, Ms. Steagall admitted that her attempts at home schooling had not been entirely successful. She conceded that she had refused to permit the parties' son to take the standardized achievement tests until after Mr. Steagall filed his petition to change custody. She explained her decision by saying that school officials had declined to permit her to examine the test in advance and because she believed that the test contained inappropriate personal questions about the household.[4] She also conceded that the parties' son had recently taken a standardized test and that this test had revealed that he was two years below grade level in science and that he was one year below grade level in reading and language arts.[5]

Mr. Steagall testified that he had initially agreed that Ms. Steagall could home school their son, even though he had reservations about home schooling. He stated that he became increasingly concerned as time went on about what the boy was studying and his attitude about his homework. He estimated that at least thirty percent of the school work was religious[6] and that he had observed a "drop in . . . [his son's] eagerness" to do his homework after Ms. Steagall withdrew the boy from public school. He also testified that Ms. Steagall had made visitation "as complicated as it could be" and recounted how Ms. Steagall had instructed him not to permit their son to accompany his new wife to Roman Catholic services because Roman Catholics were not going to heaven because they prayed to the Virgin Mary rather than to Jesus. Mr. Steagall expressed concern that the parties' son was picking up on some of the prejudicial feelings that his mother has towards different religions and different kinds of people.[7]

---

[2] Ms. Steagall admitted that she had overreacted when she threatened to have Mr. Steagall arrested for kidnaping when he took their son to Wal-Mart to purchase tennis shoes after obtaining permission from the boy's grandmother.

[3] Ms. Steagall admitted that she had told her son that she and Mr. Steagall were still married in the eyes of God and that Mr. Steagall had sinned for marrying another woman. She also admitted that she had purchased a Bible for her son to give his father as a Christmas present and that she had underlined in that Bible the passage quoting Jesus as saying "Whoever shall put away his wife, and marry another, committeth adultery against her." *Mark* 10:11 (King James). Finally, she testified that "at this present time I still really care deeply for this man [Mr. Steagall] and I care deeply for, you know, what might happen with him."

[4] Ms. Steagall objected to questions such as: "How many books are in your house?" and "How many times do you read for your child?"

[5] Ms. Steagall testified that the boy was "right at grade level" in mathematics and social studies.

[6] Ms. Steagall also testified that "We've been spending a lot of time in reading his Bible."

[7] Mr. Steagall also testified that he and his new wife had complied with Ms. Steagall's request and that the boy attends a Baptist church with his cousin when he is staying with his father.

Mr. Steagall also testified that Ms. Steagall had consistently refused to discuss his concerns about home schooling. However, after he filed his petition to change custody, Ms. Steagall indicated that she was considering enrolling their son in a small, unaccredited school operated by her church, called Lighthouse Baptist Academy.[8] While on the witness stand, Ms. Steagall confirmed that she had decided to send the parties' son to Lighthouse Baptist Academy beginning with the next school year. However, she could provide little information about the school's curriculum or activities other than to say that "they do the swimming and all the other sports."

The case took an unusual turn at the close of Mr. Steagall's proof. Ms. Steagall moved to dismiss Mr. Steagall's petition to change custody. During the colloquy that followed, Ms. Steagall's lawyer conceded that the trial court's concerns about home schooling were "legitimate" and that the parties' son was "underperforming pursuant the standardized test in home schooling." He also conceded that Ms. Steagall may have been "a little bit overprotective." However, Ms. Steagall's lawyer insisted that the trial court could remedy these matters without changing custody. He invited the trial court to enter a more specific visitation schedule, saying "that's probably what should have happened a long time ago." He also stated that it would be "legitimate" for the trial court to order Ms. Steagall to stop home schooling the parties' son and to "put him in some sort of private school."

Rather than ruling directly on Ms. Steagall's motion to dismiss, the trial court construed her lawyer's arguments as an invitation to address the education and visitation problems she had acknowledged.[9] Accordingly, the trial court told the parties "what I would do if this were all the proof that I was going to hear today." After stating that the home schooling had been "a failed experiment" and expressing concerns about the child's "isolation," the trial court stated:

> I think what I would want to do if I were deciding the case on the evidence before me is not to change custody yet, but rather to split the time during the summer equally between the parties and then go back to an arrangement during the school year where she was custodial, he had every other weekend and some additional time that would need to be worked out. With the addition that I would want him to act as custodial parent when he did have the child, because I don't think we need the kind of control that she thinks is appropriate on issues like trips to New York. I don't think he [Mr. Steagall] needs to have to get her permission to do things like that when he has the child.

---

[8] Ms. Steagall testified that her pastor had told her that the school was unaccredited because "they teach them more. Rather than just staying down here, they are way up here." She added that "Stanford is not accredited, to my understanding; Harvard's not accredited, to my understanding."

[9] Based on the trial court's statements, even a casual observer would have understood that the trial court did not intend to dismiss Mr. Steagall's petition to change custody.

She has a lot of fears. Some of them in my mind are actually grounded in the fact that she's not past this marriage yet. She's not really over him yet. Some of that is her religious beliefs, which I can respect – or I can respect that belief at any rate. But I think she is not getting on with her life a bit, and there's some fears there. There's control that she's insisting on keeping that doesn't reflect the reality of dangers to the child.

During the ensuing discussion, the parties and the trial court began negotiating the specific terms of the visitation arrangements, Mr. Steagall's modified child support obligations, which parent could claim the child as a dependent for federal tax purposes, and the possibility of awarding Ms. Steagall her attorney's fees. During the discussion regarding visitation during the summer of 1998, the following exchange between the trial court and Ms. Steagall's lawyer occurred:

> MR. WINGO: And then at the end of the summer, I guess when school starts, he would – Your Honor would require him to go to regular school?
>
> THE COURT: Yes.
>
> MR. WINGO: Okay.
>
> THE COURT: We will have to define regular school.

On two occasions, the trial court declared a recess to enable the lawyers to consult with their clients about the terms of their agreement and to enable the trial court to discuss the proposed summer visitation arrangements with the parties' child.

At the conclusion of these discussions, the parties had agreed to a modified specific visitation schedule and an increase in Mr. Steagall's child support. Without asking the trial court to rule on his motion to dismiss and without calling any of the witnesses who were present to testify on Ms. Steagall's behalf, Ms. Steagall's lawyer simply asked the trial court if it was going to prepare the order containing the parties' agreements.[10] Mr. Steagall's lawyer volunteered to draw the order after the trial court declined and assured Ms. Steagall's lawyer that he would send him a draft.

Mr. Steagall's lawyer prepared an order reflecting his understanding of the parties' agreements with the court. We surmise that he provided a copy of this order to Ms. Steagall's lawyer

---

[10]We are left to speculate about the reason for this tactical decision. It could have been the lateness of the hour because at that time it was approaching 5:40 p.m., or it could have been the belief that the parties had settled all their disputes. We have concluded that the latter is more probable. Had Ms. Steagall's lawyer intended to present additional evidence, he would have inquired when the trial would resume. His inquiry regarding the preparation of the order is more consistent with a belief that the parties' disputes had been resolved because an order would otherwise have been unnecessary.

since the copy of the order presented to the trial court contained the signatures of both lawyers indicating that the order was "approved for entry." Reflecting the discussions during the June 12, 1998 hearing, the order (1) contained a well-defined visitation schedule, (2) provided that Mr. Steagall would have all the rights of a custodial parent while his son was visiting him, (3) increased Mr. Steagall's child support from $70 per week to $116.19 per week, (4) provided that the parties would alternate claiming their son as a tax deduction, and (5) ordered Ms. Steagall to refrain from making "gratuitous criticisms" of Mr. Steagall in their son's presence. In addition, the order directed Ms. Steagall to enroll the parties' son in "public school."

On July 8, 1998, apparently after he signed the proposed order, Ms. Steagall's lawyer sent a facsimile to the trial court apparently objecting to the portion of the order directing Ms. Steagall to enroll the parties' child in public school.[11] On July 9, the trial court sent the following letter by facsimile to the lawyers for both parties:

> I am in receipt of John's [Ms. Steagall's lawyer's] fax of July 8, 1998, at 4:21 P.M.
>
> At the end of the evidence in this case, I felt that Mrs. Steagall had made some decisions about the rearing of . . . [the parties' son] that raised serious doubts about her fitness to raise the child in the absence of active direction by me. It was my understanding of John's closing statement that he and Mrs. Steagall were asking that I modify any unacceptable custodial decisions by Mrs. Steagall *in lieu* of changing custody outright to Mr. Steagall. I believe that if you will examine the transcript of the closing statements, you will find that John made that "offer." I think you will also find that in a question put to me by John after I had begun to announce my opinion, he made reference to a change to "public school" and I responded in the affirmative. It is possible that this exchange was off the record, but I do not believe that it was. I may have been asked by Barry [Mr. Steagall's lawyer] at some point what my ruling had been at an earlier point, but no part of my decision was announced in John's absence. I intended for the child to be in public school.
> If I misunderstood John's offer to allow me to make what are ordinarily custodial decisions, and if Ms. Stegall [sic] is now insisting on her right to have the child in a parochial school, then I think we need to resume the hearing. I want to revisit the issue of custody if my choice is between an "unsupervised" custody by Ms. Stegall [sic] and custody by Mr. Stegall [sic].
>
> I have to say again that I am utterly amazed that an elected member of the Maury County Board of Education refuses to have her son in the public schools of Maury County.
>
> Please schedule the resumed hearing if we are going to need one.

---

[11]Because this facsimile was not included in the record, we cannot know with certainty either the contents of the facsimile or whether the facsimile was sent contemporaneously to Mr. Steagall's lawyer. We presume that Ms. Steagall's lawyer also sent the facsimile to Mr. Steagall's lawyer because to do otherwise would have amounted to an inappropriate ex parte communication. Based on the trial court's response, it is safe to conclude that the facsimile must have dealt with the public school issue.

The record does not reveal when or if Ms. Steagall's lawyer ever responded to the trial court's July 9, 1998 letter. What is certain is that on July 10, 1998, the trial court entered the order prepared by Mr. Steagall's lawyer and signed by both counsel. It is also certain that Ms. Steagall never attempted to schedule the "resumed hearing" mentioned in the trial court's letter and never filed a Tenn. R. Civ. P. 59 motion to alter or amend the judgment. Instead, Ms. Steagall replaced her lawyer with another lawyer furnished to her without charge by The Rutherford Institute[12] and filed a notice of appeal.

## I.

At the outset, we express our concern about the effect that the informality of the proceedings during and after the June 1998 trial had on the appellate record. Both the trial court and counsel for the parties appear to have lost sight of the fact that Tennessee's civil trial courts are "courts of record"[13] whose proceedings are governed by the Tennessee Rules of Civil Procedure. Accordingly, all motions or other applications to the trial court for an order, unless made during the course of a trial, should be in writing and filed with the court. Tenn. R. Civ. P. 7.02(1). Similarly, all of a trial court's orders and judgments, excluding rulings made during the course of trial, should be reduced to writing and entered on the minutes. *Allen v. McWilliams*, 715 S.W.2d 28, 29 (Tenn. 1986).

As far as this record shows, the July 8, 1998 facsimile sent by Ms. Steagall's lawyer to the trial court was not presented in the form of a motion and was never formally filed with the trial court. We know nothing of its substance, and we know of its existence only because the trial court referred to it in its July 9, 1998 facsimile to the lawyers. While the reliance on facsimile technology is now widespread in the legal profession, its application in judicial proceedings is limited.[14] To conform to the plain requirements of Tenn. R. Civ. P. 7.02(1), Ms. Steagall's lawyer should have communicated his client's disagreement with the proposed order prepared by Mr. Steagall's lawyer using a written motion duly filed with the trial court and entered on the permanent records of the court.

---

[12] According to the notice of appearance and brief filed by Ms. Steagall's new lawyer, The Rutherford Institute is "nonprofit religious based civil liberties organization that defends the rights of persons of all religious faiths throughout the United States on a pro bono basis.... Protecting the religious rights for all Americans in the face of direct attack on those rights is the interest of TRI."

[13] *Page v. Turcott*, 179 Tenn. 491, 503, 167 S.W.2d 350, 354 (1943) (circuit courts); *Massengill v. Massengill*, 36 Tenn. App. 385, 390, 255 S.W.2d 1018, 1020 (1953) (chancery courts).

[14] Lawyers may file motions and other documents by facsimile only in the Sixteenth Judicial District. *In re Petition For Facsimile Filings in the Trial Courts of Rutherford County* (Tenn. Dec. 20, 1990). In other circumstances, the Tennessee Supreme Court has declined to approve the transmission and filing of documents by facsimile. *Love v. College Level Assessment Servs., Inc.*, 928 S.W.2d 36, 38-39 (Tenn. 1996).

This case is also another example of the problems that can occur when a trial court chooses to communicate its decisions to the parties using some means other than an order entered on its minutes. Like the July 8, 1998 facsimile from Ms. Steagall's lawyer, the trial court's July 9, 1998 facsimile to the parties was apparently never entered on the trial court's minutes. Accordingly, the trial court's decision – which is of pivotal importance in the case – would have been missing had Ms. Steagall's appellate lawyer not requested that his client's copy be included in the record. The trial court should have responded to Ms. Steagall's lawyer's July 8, 1999 facsimile with a written order that could have been entered on the minutes of the court.

Notwithstanding these shortcomings, we have pieced together the events that most likely occurred in the trial court. If we are mistaken in any particular, our error is due, not to a lack of effort to read the tea leaves we have been provided, but rather to the lack of an adequate appellate record. We are, at least, confident that the record, such as it is, provides an adequate factual basis for our disposition of this appeal.

## II.

The outcome-determinative issue in this case does not involve Ms. Steagall's decision to home school the parties' son. It is axiomatic that following a divorce, the parent granted sole custody of a child has the prerogative to make the major decisions regarding the child's upbringing, subject of course to the court's oversight. *Neely v. Neely*, 737 S.W.2d 539, 542 (Tenn. Ct. App. 1987). Thus, in the absence of some limitation imposed by the courts, the custodial parent has the sole power to determine the course of a child's education. *Hoefler v. Hoefler*, No. M1998-00966-COA-R3-CV, 2001 WL 327897, at *5 (Tenn. Ct. App. Apr. 5, 2001) (No Tenn. R. App. P. 11 application filed). The courts should interfere as little as possible with post-divorce family decisions, *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 484 (Tenn. Ct. App. 1997). Accordingly, the courts should decline to second-guess a custodial parent's decisions regarding his or her child's education unless these decisions are contrary to state law or harmful to the child. *Rust v. Rust*, 864 S.W.2d 52, 56 (Tenn. Ct. App. 1993).

Home schooling is an educational alternative that is entirely consistent with state law. *Rust v. Rust*, 864 S.W.2d at 56. Thus, Ms. Steagall's decision to home school the parties's son, in and of itself, is not subject to judicial review. However, the question does not end there. The courts may, and in fact must, intervene when they are presented with competent evidence that the home schooling in a particular case is harming the child. Evidence that a child is being adversely affected by home schooling provides the trigger required by Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2000) because it substantiates the existence of a change in the child's circumstances that is adversely affecting the child in a material way. *See Hoalcraft v. Smithson*, No. M2000-01347-COA-R10-CV, 2001 WL 775602, at *17 (Tenn. Ct. App. July 10, 2000) (No Tenn. R. App. P. 11 application filed); *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *3 (Tenn. Ct. App. July 21, 1999) (No Tenn. R. App. P. 11 application filed) (requirements for changing custody).

The trial court found that Ms. Steagall's efforts at home schooling were a "failed experiment." The record contains ample evidence to support this conclusion, and even Ms. Steagall conceded that home schooling had harmed the parties' son. Her lawyer admitted that the trial court's concerns about the child's lack of achievement were "legitimate," and Ms. Steagall herself stated that she had decided to discontinue home schooling beginning in the 1998-1999 school year. Accordingly, the propriety of home schooling as opposed to other educational experiences is not before the court in this case.

Similarly, the outcome of this case does not hinge on whether the July 19, 1998 order was an agreed order. To be sure, parties ordinarily may not challenge orders they have agreed to and acknowledged in open court. *Harbour v. Brown*, 732 S.W.2d 598, 600 (Tenn. 1987); *REM Enters., Ltd. v. Frye*, 937 S.W.2d 920, 922 (Tenn. Ct. App. 1996). However, even if a party has initially agreed to an order, it is free to withdraw its agreement any time before it is formally accepted by the trial court in open court or signed and entered as the judgment of the court. Thus, in the words of the Tennessee Supreme Court, "a valid consent judgment cannot be entered by a court when one party withdraws his [or her] consent and this fact is communicated to the court prior to the entry of the judgment." *Harbour v. Brown*, 732 S.W.2d at 599.

Viewed in its most charitable light, Ms. Steagall and the trial court had different understandings about the significance of the trial court's insistence that the parties' son could be required to attend "regular" school. In using this phrase, the trial court evidently meant "public school." However, Ms. Steagall evidently understood the phrase to mean any school other than home schooling. This misunderstanding came to a head when Ms. Steagall's lawyer sent a facsimile to the trial court on July 8, 1998, apparently objecting to the provision in the proposed order requiring her to enroll the parties' child in public school. Based on the record before us, there is no question that Ms. Steagall never specifically agreed in open court to send the parties' child to public school and that her lawyer communicated the withdrawal of her consent to the proposed order before the trial court entered it on July 10, 1998. Accordingly, the trial court should not have entered the proposed order on July 10, 1998 containing the provision directing Ms. Steagall to enroll the child in public school unless it received an additional communication from Ms. Steagall after its July 9, 1998 facsimile stating that she had withdrawn her objection to the proposed order.[15]

### III.

The outcome-determinative issue in this case involves whether Ms. Steagall is entitled to seek appellate relief from the trial court's July 10, 1998 order. Even when a trial court commits plain error, the aggrieved party will not be entitled to relief on appeal if it was responsible for the error or if it "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of . . . [the] error." Tenn. R. App. P. 36(a). Based on this record, Ms. Steagall could have easily nullified the harmful effect of the trial court's July 10, 1998 order but deliberately chose not to.

---

[15]There is no direct or indirect indication in this record that Ms. Steagall ever withdrew her objection to the portion of order eventually filed on July 10, 1998, directing her to enroll the parties' child in public school.

Unless Ms. Steagall withdrew her objection to the proposed order, the trial court should not have entered the order requiring that Ms. Steagall enroll the parties' child in public school. However, on July 9, 1998, the trial court informed Ms. Steagall's lawyer that it would "resume the hearing" if its understanding of the parties' agreement during the June 1998 hearing was incorrect. In fact, the trial court invited Ms. Steagall's lawyer to "reschedule the resumed hearing if we are going to need one." Based on this unequivocal offer, it is clear that the trial court would have resumed the trial had Ms. Steagall so requested prior to July 10, 1998, and that the trial court also would have vacated its July 10, 1998 order and resumed the trial had Ms. Steagall filed a timely Tenn. R. Civ. P. 59.04 motion to alter or amend. Ms. Steagall chose not to pursue either remedy.

This court has held that a party who declined four offers for a mistrial could not obtain appellate relief from the error that would have entitled her to a mistrial. *Harwell v. Walton*, 820 S.W.2d 116, 120 (Tenn. Ct. App. 1991). While *Harwell v. Walton* is couched in terms of "waiver," Ms. Harwell in reality forfeited her right to appellate relief by failing to pursue the relief readily available to her – the mistrial – that would have nullified the harmful effect of the error in the trial court. Like the trial court's offers of a mistrial in *Harwell v. Walton*, the trial court in this case offered to resume the trial to enable Ms. Steagall to present whatever evidence she could muster to support her decision to send the parties' child to Lighthouse Baptist Academy. Ms. Steagall, for reasons of her own, decided not to accept the trial court's offer. Had she done so, this appeal would have been entirely unnecessary.[16] Accordingly, in accordance with Tenn. R. App. P. 36(a), we have concluded that this appeal must be dismissed.

## IV.

We dismiss this appeal and affirm the judgment of the trial court. We remand the case to the trial court for whatever further proceedings may be required consistent with this opinion. We also tax the costs of this appeal to Nancy Rose Steagall and her surety for which execution, if necessary, may issue.

---

WILLIAM C. KOCH, JR., JUDGE

---

[16]We are not saying that there would have not have been an appeal following the resumed trial. Had the trial court dismissed Mr. Steagall's petition to change custody, Mr. Steagall may very well have appealed. On the other hand, had the trial court decided to award Mr. Steagall custody of the parties' child, Ms. Steagall could, and probably would, have appealed. However, in that circumstance, the issues would have involved whether the trial court had an adequate basis to change custody.